DECISION
{¶ 1} In this original action, relator, Deborah Kappes, requests a writ of mandamus ordering respondent, Industrial Commission of Ohio ("commission"), to vacate its order denying her permanent total disability ("PTD") compensation, and to enter an order granting her the requested PTD compensation. *Page 2 
 {¶ 2} This matter was referred to a magistrate of this court pursuant to Civ.R. 53 and Loc.R. 12(M) of the Tenth District Court of Appeals. The magistrate examined the evidence and issued a decision (attached as Appendix A), including findings of fact and conclusions of law. Therein, the magistrate concluded that relator has not demonstrated that the commission abused its discretion in denying her request for PTD compensation and, therefore, the magistrate recommended that this court deny relator's request for a writ of mandamus.
 {¶ 3} In her objections, relator makes two arguments: (1) that the commission ignored evidence; and (2) that the magistrate conducted a de novo review of the evidence. Upon review, however, we do not find relator's objections to be well-taken.
 {¶ 4} Following an independent review of the matter, we find that the magistrate has properly determined the facts and applied the appropriate law. Therefore, relator's objections to the magistrate's decision are overruled, and we adopt the magistrate's decision as our own, including the findings of fact and conclusions of law contained therein. In accordance with the magistrate's decision, we deny the requested writ of mandamus.
 Objections overruled; writ denied. BROWN and FRENCH, JJ., concur. *Page 3 
 APPENDIX A MAGISTRATE'S DECISION Rendered March 31, 2008 IN MANDAMUS {¶ 5} In this original action, relator, Deborah Kappes, requests a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order denying her permanent total disability ("PTD") compensation, and to enter an order granting said compensation.
Findings of Fact: *Page 4 {¶ 6} 1. Relator has an industrial claim that is allowed for "carpal tunnel syndrome left; right shoulder impingement syndrome; supraspinatus rotator cuff tear-right; left shoulder impingement syndrome," and is assigned claim number 01-321697. January 26, 2001 is recognized as the date of diagnosis. At the time of her industrial injury, relator was employed as an "office coordinator" for respondent Shoe Carnival, Inc. ("employer"), a state-fund employer.
 {¶ 7} 2. On January 11, 2007, relator filed an application for PTD compensation.
 {¶ 8} 3. The PTD application form asks the applicant to provide information regarding his/her work history. Relator indicated that she had been employed for ten years as "Operations Coordinator Retail Store." Where the form asks the applicant to describe the job's basic duties, relator wrote:
 Training managers, human resource personnel, and other employees. Provided clerical and financial support, including bookkeeping and computer work. Unloading trucks, setting up displays, and stocking small accessories. My job duties required frequent standing, reaching, climbing, carrying, squatting kneeling, and lifting up to 50 pounds.
 {¶ 9} 4. On May 18, 2007, at the commission's request, relator was examined by Andrew Freeman, M.D. In his narrative report, Dr. Freeman wrote:
 HISTORY OF PRESENT ILLNESS: Ms. Kappes is a 52-year-old female who was working for Shoe Carnival as an office coordinator on the date of injury, January 26, 2001. She states that using a computer repetitively and writing frequently with her left hand caused her to develop wrist pain 3 years prior to the date of injury in the claim. She states that she also had a great deal of overhead work to perform in the job, as she would restock shoes frequently. She denied any previous left wrist or any shoulder injuries before working at Shoe Carnival. She states that she did have a right carpal tunnel syndrome diagnosis in 1995, however, this was denied in the worker's compensation system, and she had *Page 5 
right carpal tunnel release surgery performed with her private insurance.
 Ms. Kappes had the left carpal tunnel syndrome diagnosed via EMG with nerve conduction velocity studies in 2001. She cannot recall where she had her initial medical care but was referred to Dr. Due, a hand surgeon, performed left carpal tunnel decompression surgery on February 20, 2002. This surgery was unfortunately of no help. Postoperatively, on May 12, 2002, her left arm EMG with nerve conduction velocities reportedly showed a significant improvement from her preoperative studies. The EMG portion of the exam was entirely normal. On August 16, 2002, the MRI of the left wrist showed no abnormalities. On October 31, 2002 a right shoulder MRI showed a full-thickness supraspinatus rotator cuff tear with impingement. A slight degree of glenohumeral arthropathy was also seen. On October 3, 2003, Dr. Bilbo performed a rotator cuff repair surgery on the right shoulder with decompression. Ms. Kappes states that this was helpful for approximately one year, but then the shoulder pains recurred.
 She has had many rounds of physical therapy, but states that these have not been of any help. She did undergo vocational rehabilitation in 2005 for about two weeks until the increased pain led to her quitting the program. She has never been in a formal pain management program. She has had shoulder steroid injections that helped for approximately 2 weeks at a time. She states that she said [sic] 3 or 4 of these. She does not use any type of a wrist brace at this point.
 Currently she has left wrist pain radiating into the index and long fingers primarily. This pain is worse at night. She also has left greater than right shoulder pain. She has not had any surgeries involving the left shoulder.
 Currently her pain is 4 out of 10 at best and 10 out of 10 at worst. She does have trouble sleeping most nights because of the pain. She states that the pain has worsened in the last 6 months. * * *
 {¶ 10} 5. On May 18, 2007, Dr. Freeman completed a physical strength rating form. The form contains the definitions of sedentary work, light work, medium work, etc., *Page 6 
as those definitions are found at Ohio Adm. Code 4121-3-34(B)(2). On the form, Dr. Freeman placed a mark to indicate that relator is capable of performing sedentary work. However, he indicated further limitations: "No repetitive use of the left hand / No reaching or overhead work with either arm."
 {¶ 11} 6. Following an August 20, 2007 hearing, a staff hearing officer ("SHO") issued an order denying the PTD application. The SHO's order explains:
 The Injured Worker is a 52 year old female who has one Workers Compensation claim. This claim, claim number 01-321697, is predicated upon an industrial accident which occurred on 01/26/2001 when the Injured Worker injured her left wrist and bilateral shoulders while repetitively writing and operating a computer.
 Dr. Andrew Freeman examined the Injured Worker on 05/18/2007 at the request of the Industrial Commission. Dr. Freeman examined the Injured Worker on the allowed physical conditions and concludes that the allowed physical conditions have reached maximum medical improvement.
 Dr. Freeman further opines that the Injured Worker retains the ability to perform sedentary employment with the restriction that the Injured Worker should not repetitively use her left hand and should not engage in overhead work. Sedentary employment includes the ability to exert ten pounds of force one third of the time, negligible force two thirds of the time and sedentary employment is performed while sitting most of the time.
 The Staff Hearing Officer finds that the allowed conditions in this claim have reached maximum medical improvement based on the report of Dr. Freeman.
 The Staff Hearing Officer additionally finds that the Injured [W]orker retains the functional capacity to perform sustained remunerative employment when the impairment arising out of the allowed conditions is considered based on the report of Dr. Freeman.
 Further, when the Injured Worker's impairment arising out of the allowed conditions is considered in conjunction with the *Page 7 
Injured Worker's non medical disability factors, the Staff Hearing Officer finds that the Injured Worker retains the functional capacity to perform sustained remunerative employment and is therefore not permanently and totally disabled.
 The Staff Hearing Officer finds that the Injured Worker's age, 52 years old, constitutes a mild barrier to re-employment. However, the Staff Hearing Officer finds that the Injured Worker's age in no way constitutes an insurmountable barrier to re-employment.
 Expressly, individuals of the Injured Worker's age expect to remain in the work force for a number of years. Further, individuals of the Injured Worker's age have the ability to pursue the acquisition of new job skills, through short term or on the job training, which would enhance the Injured Worker's potential for re-employment.
 The Staff Hearing Officer finds that the Injured Worker has completed the 11th
grade and has attained a GED Certificate. Further, the Staff Hearing Officer finds that the Injured Worker has completed training courses in accounting and clerical management at Northern Kentucky Vocational School.
 The Staff Hearing Officer finds that the Injured Worker's educational history indicates that the Injured Worker can read, write and perform basic math skills, as would be expected of an individual with the Injured Worker's level of formal education. Further, a GED certificate ordinarily qualifies the Injured Worker for semi-skilled to skilled employment. See OAC 4121-3-34(B)(3)(b)(iv). Accordingly, the Staff Hearing Officer finds that the Injured Worker's educational background constitutes a positive vocational asset which enhances the Injured Worker's ability to gain re-employment.
 The Staff Hearing Officer finds that the Injured Worker's IC-2 Application for Permanent Total Disability Compensation indicates that the Injured Worker has previously been employed as an operations coordinator and an assistant office manager. These jobs required the Injured Worker to supervise anywhere from twenty to one hundred employees, train managers, train human resources employees, provide clerical support, bookkeeping support and financial support. *Page 8 
 In addition, the Injured Worker had to have a working knowledge of computers.
 Accordingly, the Staff Hearing Officer finds that the Injured Worker's prior work history has provided the Injured Worker with the transferable skills, such as the ability to use a computer, supervise other employees, balance books and perform clerical work, necessary to perform sedentary employment. Therefore, the Staff Hearing Officer finds that the Injured Worker's prior work history constitutes a positive vocational asset which enhances the Injured Worker's ability to gain re-employment.
 Based on these non-medical disability factors, the Staff Hearing Officer finds that the Injured Worker has the education, intellect and literacy abilities to perform sustained remunerative employment.
 Further, when the Injured Worker's non-medical disability factors are considered in conjunction with the Injured Worker's physical impairments arising out of the allowed conditions, the Staff Hearing Officer finds that the Injured Worker retains the functional capacity to perform sustained remunerative employment and is therefore not permanently totally disabled.
 Accordingly, the Injured Worker's IC-2 Application for Permanent Total Disability Compensation, filed 01/11/2007, is denied.
 This order is based on the report of Dr. Freeman dated 05/18/2007 and the non-medical disability factors.
 {¶ 12} 7. On October 3, 2007, relator, Deborah Kappes, filed this mandamus action.
Conclusions of Law: {¶ 13} Relator claims that the SHO erred in two respects: (1) misstating the definition of sedentary employment, and (2) misstating Dr. Freeman's restrictions. On that basis, relator argues that a writ of mandamus must issue. The magistrate disagrees.
 Turning to the first issue, Ohio Adm. Code 4121-3-34(B)(2)(a) states: *Page 9 
 "Sedentary work" means exerting up to ten pounds of force occasionally (occasionally: activity or condition exists up to one-third of the time) and/or a negligible amount of force frequently (frequently: activity or condition exists from one-third to two-thirds of the time) to lift, carry, push, pull, or otherwise move objects. Sedentary work involves sitting most of the time, but may involve walking or standing for brief periods of time. Jobs are sedentary if walking and standing are required only occasionally and all other sedentary criteria are met.
 In the order, the SHO states:
 * * * Sedentary employment includes the ability to exert ten pounds of force one third of the time, negligible force two thirds of the time and sedentary employment is performed while sitting most of the time.
 {¶ 14} According to relator, this is an incomplete and therefore inaccurate definition of sedentary work. According to relator, the SHO left out an important "qualifier" by failing to note that a negligible amount of force can be used frequently "to lift, carry, push, pull, or otherwise move objects." (Relator brief, at 6.)
 {¶ 15} Relator's argument ignores the SHO's use of the word "includes." The SHO clearly signals to the reader that the SHO is not endeavoring to state the complete definition of sedentary work. Relator does not argue here that the definition does not include the concepts that the SHO listed in the order.
 {¶ 16} In short, an incomplete definition is not automatically an inaccurate one, particularly where the SHO notes that it is incomplete. Relator's argument regarding the definition of sedentary work lacks merit.
 {¶ 17} Turning to the second issue, Dr. Freeman wrote on the physical strength rating form: "No repetitive use of the left hand / No reaching or overhead work with either arm." *Page 10 
 {¶ 18} In his order, the SHO states:
 Dr. Freeman further opines that the Injured Worker retains the ability to perform sedentary employment with the restriction that the Injured Worker should not repetitively use her left hand and should not engage in overhead work. * * *
 {¶ 19} Relator points out that the SHO failed to note that Dr. Freeman restricted "reaching." Relator also argues that the SHO failed to note that the overhead work restriction applies to "either arm."
 {¶ 20} The magistrate disagrees that the SHO's statement about Dr. Freeman's overhead work restriction is evidence that the SHO failed to recognize that the restriction applies to either arm. The SHO's failure to specify that the overhead work restriction applies to either arm can be easily read to mean that the restriction applies to all overhead work. Given that the SHO was endeavoring to present Dr. Freeman's restrictions applicable to either arm, there is simply no reason to adopt relator's interpretation.
 {¶ 21} The magistrate does agree that the SHO failed to mention the "reaching restriction." Moreover, while overhead work can involve reaching above the head, the overhead work restriction itself does not encompass all reaching. For an obvious example, reaching at waist level would not be equatable with reaching overhead.
 {¶ 22} Notwithstanding the flaw in the SHO's statement of Dr. Freeman's restrictions, in the magistrate's view, the flaw is not fatal and does not warrant the issuance of a writ of mandamus.
 {¶ 23} Analysis begins with the presumption of regularity that attaches to commission proceedings. State ex rel. Lovell v. Indus.Comm. (1996), 74 Ohio St.3d 250, 252. Here, relator invites this court to infer that the SHO's incomplete listing of Dr. *Page 11 
Freeman's restrictions in the order is proof that the SHO misread or misunderstood Dr. Freeman's report. But an equally valid inference is that the SHO read and understood the reports of Dr. Freeman, but simply failed to state all of the restrictions in the order. The presumption is that the SHO understood the medical reports upon which he relied. The SHO's failure to state all the restrictions contained in Dr. Freeman's reports does not rebut the presumption of regularity.
 {¶ 24} Moreover, relator fails to explain how any alleged failure to understand the reaching restriction might flaw the nonmedical analysis. The SHO relied upon transferable skills such as the ability to use a computer, supervise other employees, balance books and perform clerical work. While those work activities require use of the hands and arms, they do not necessarily require reaching.
 {¶ 25} Accordingly, for all the above reasons, it is the magistrate's decision that this court deny relator's request for a writ of mandamus. *Page 1